Good morning, Your Honors. My name is Scott Minder, and I would like to start by talking just a little bit about the uncontroverted evidence in this case. My client, Petitioner Patap Rawat, married an American girl who was not of his caste or of his religion. And he began receiving phone calls from people who identified themselves as being with hardline groups, intent on maintaining the caste structure through enforcement of marriage traditions. He eventually received hundreds of these calls, and they became more grave as time went on. Why did he come to the United States? Because he was tired of waiting for a visa or to flee the persecution? Your Honor, I believe that the answer is that he was trying to flee the persecution. And I understand that in the immigration judge's decision, there was a speculation that the real reason may have been that he was tired of waiting for his visa. But there's just no – there's no evidence that that was the case. The Cultic couple were ultimately divorced, weren't they? That's correct. And when did that occur, before or after he attempted to enter? Your Honor, I don't have a specific timeline. I do know that in his – Can you tell the panel if it was before or after his attempted entry? Your Honor, I don't know the answer to that question. What I do know is that – Wouldn't it make a difference to the plausibility of his claim, which is what the IJ and the BIA apparently turned their decision on? Your Honor, I don't think so. Well, what is in the record is that there was – that he had been asked to divorce. So that is certain. I don't know precisely when it became official. However, the case law does suggest that you can have more than one motive for fleeing, and this concept that he was fleeing for because his visa application wasn't up is just one of those options. There's no restriction that that's the only option. Given that he's claiming persecution on account of having been married or being married to someone not of his caste or religion, now that he's divorced, why would he have any fear of future persecution? Your Honor, the scene declaration talks about this a little bit, and also it's in his testimony. This is a – these groups have their power based on keeping unity within their people. So they want to enforce the marriage traditions. And once he has – Why can't he go back and say, we're divorced? Because he's still somebody who has pushed on those traditions. He's somebody who has married outside of his caste. And those are – and these people will then, at least according to the declarations and according to his testimony, will see him as somebody who sort of still has that stigma and still can be somebody who can be made an example of. Is there any – excuse me. Is there any evidence in the record that individuals in similar circumstances, that is, somebody who married outside the caste but then got a divorce, was subject to persecution? Your Honor, other than the declaration and his own testimony, the declaration from Mr. Singh, there is no specific discussion about what happens when you are divorced. He says that he continues to fear persecution even though he's divorced. Yes, Your Honor. And that's in his declaration. That's – no, that's in his testimony. His testimony. And then the additional declaration of Mr. Singh. Any other evidence? Is that fear of more hostile phone calls when he gets back to England – back to India? Your Honor, he doesn't specifically state what exactly he's afraid of. But at this point, you know, he has received phone calls. He has to have a well-founded fear of persecution for a protected reason. Hostile phone calls – people can get hostile phone calls for putting the wrong picture on Facebook. But does that mean that they can get political asylum? Your Honor, that's a good point. But he is still being – if he were to receive hostile phone calls and be beaten or attacked again, that would be on behalf or because of the fact that he is – or he is somebody who has married outside of his caste. It wouldn't be for any other reason. What do we do with the IJ's adverse credibility finding? Well, Your Honor, I think that once you take a look at all of the different points that we've raised about how the IJ got to that point, starting with the idea that this is all because of a delay in the visa application, then that adverse credibility determination goes away. And, in fact, it's not just his testimony.  There are two declarations, one from Mr. Singh, one from Mr. Sharma. There's a police report talking. In all of those declarations in the police report are examples of people confirming that, yes, Mr. Rawat, while he was in India, was saying, I am receiving these calls, people are following me. So it's not just simply removing the adverse inferences that came about, but there's also concrete declarations in the record that support his claims. One of the problems, I think, that you have in this case is the burdens that are – that were enacted with the Real ID Act, and this is a Real ID Act case, right? That is correct, Your Honor. And so under the Real ID Act, the IJ is allowed to seek corroboration, even if she had found the testimony reliable and she found glaring the absence of the telephone records to support the phone calls that he received, as well as medical evidence of the treatment that he received after the one incident where he was assaulted. That's correct, Your Honor. Those are two good points, and I'd like to address both of them. With the phone records, it is certainly true that the Real ID Act applies and that there is a standard for corroborative evidence. But from the BIA's own decision, what's required is to corroborate the material facts, which are central to his or her claim. The phone records themselves don't have any context of what was said. And if you were to use the phone – But it would indicate that they were made. Well, if you were looking to see if they were made, then you're taking a stack of records from 19 months, somebody who's using this phone for business purposes and personal purposes and expecting the IJ to believe then that he can go through that stack of papers and identify precisely which calls were the ones that were from these people. That, again, is basically relying on his testimony to provide that. So I'm not sure exactly what material portion, what material fact is relevant to his claim. There's a note in the opinion that says that perhaps it would show that he changed his numbers. Well, changing your numbers is not essential. It's not part of this claim. It's simply just a piece of – it's just a fact that can be verified. It's not a requirement that somebody change numbers to support their silent claim. I'm sorry. I'm looking at your brief at – the blue brief at page 8. And the opening line says, The long separation while Mr. Rawat was in India and Ms. Grassi was in the United States strained their relationship and she ultimately asked for a divorce. Doesn't that suggest that she at least asked for a divorce while he was still in India? Yes, it does, Your Honor. I don't dispute that. I just – I don't – I again go back to the requirement of – or the case that says you need not have one particular motive for flight. And in this case, you know, all of the – what evidence there is all supports the fact that he was being attacked. He was receiving these calls and he was beaten. Okay. Do you mind if I save the remainder of your time? I would love to do that. Thank you, Your Honor. Thank you. Your Honors, may it please the Court, Eric Marsteller for the Attorney General. Quickly touching on the divorce issue, the record does indicate that Ms. Grassi asked for a divorce prior to his coming to the United States. Their last conversation was, according to Mr. Rawat, was in September of 2007, and then he came to the United States in January of 2008. There is, I believe, no evidence in the record that they actually have been divorced. So whether that has actually occurred or not is not, I don't think, in the record. But we do – there are indications that she asked for it prior to his departing India. I read somewhere in one of the briefs they were divorced. I don't recall that in the record, and I can check that, Your Honor, when I return. But I don't recall they actually being divorced in the record. I just recall his testimony that he had – she had asked for a divorce. And in Dukander, I feel like I should point that out. The issue here is whether the record compels the conclusion that Rawat submitted sufficient background evidence corroborating his claim that someone in his position, a Hindu, who was married to a Christian foreign national, would be subject to harm on account of background, let alone that any harm specifically happened to him. So it's really the broad plausibility – the broad implausibility of his case that the Immigration Judgment Board based their decisions on. And we believe that the Board's decision was reasonable because the – including State Department reports and an article he specifically cites in his briefs indicate that Hindu females are often subject to interference from their families if they are going to marry out of caste. For instance, if they marry members of a different caste or if they marry members of a different religion. Most of the specific examples in the record indicate that there is this interference and harm when a Hindu woman is bound to marry a Muslim man. Here in this case, obviously, Ms. Grassi is an American. She's a Christian. Mr. Rawat is a Hindu. There's no indication – there's no evidence compelling the conclusion that someone in his circumstances would have a well-founded fear of persecution. Did the Petitioner submit news articles which confirm violence towards inter-caste and inter-religious relationships? In the news articles he cites, there is one which was referred to specifically by the Board, which uses the language you referred to, Your Honor, that there's inter-caste, inter-marriage violence. But all of the specific examples following that introductory paragraph cite two cases where it's the Hindu female and her family who are the ones taking action. Doesn't the Country Conditions Report also discuss a rise in Hindu nationalism, hate propaganda against Islamic and Christian communities, and direct violent attacks on minority communities, most notably Christians and tribals? That's in the record, isn't it? That is, Your Honor, although Mr. Rawat is Hindu. He is not Christian. He is not Muslim. He is not a member of a Muslim – of a minority community. And there's – Ms. Grassi's risk of harm is not at issue here, is Mr. Rawat's. I'm curious about the phone and the phone calls. Was that a cell phone, do we know? He – I think he indicated that it was landline and cell phone. He indicated initially that he had used a cell phone. It seemed to be a contract, kind of like the – what we would see, like the 12-month contract where you get the bill every month. And then he said he later changed to prepaid phone calls – or not the prepaid phone calls, the prepaid cell phone, which he, I think, intimated would not necessarily have the same sort of records as a contract phone. But – so it seemed that it was a mix – initially landlines and then later mostly cell phones, I believe is what the record shows. And we believe that – Because I'm just wondering whether – I know there's, in the United States, these cell phones – that the cell phone calls are stored under a feral statute. And then they cannot be given up. I don't know what the lie is in India. And neither do I, Your Honor. And that's the sort of thing – if those claims weren't available, that's the sort of thing that Mr. Rawat could have explained to the immigration judge, that he simply said that he didn't think any such records would be helpful because – for the reasons given by opposing counsel, because that they wouldn't specifically be able to identify which calls were the threatening phone calls. We believe the immigration judge reasonably proved that if there were hundreds of phone calls made, such records would have at least – would have been helpful in one, to show that maybe there were the same numbers over and over again appearing for what probably were short phone calls. It would also indicate – he could give indications that when he did change his phone numbers. If he did, in fact, change his phone numbers on multiple occasions during this year-and-a-half period and never received the calls, such records would be helpful in indicating that. But we're supposed – you're – you argue that we're limited – our review is limited to the BIA decision. In large part, yes, Your Honor. With respect to the phone calls, that's the one part of the Board's decision that has specifically stated its agreement with the immigration judge's decision. So with respect to the phone – or that was one of the main parts. So with respect to the phone calls, we believe the Court is looking at the Board's underlying factual findings related to that. On the page 3 of the Board decision, I believe, page 4 of the record, in the last full paragraph – or let me make sure I've got that right. Yeah, in the last full paragraph, the last sentence actually is about the phone records. And we believe that the Board is therefore relying on the immigration judge's factual findings. So the Court, with respect to the phone records, is also looking at the immigration judge's decision. And just for example of the background evidence, the State Department country report on page 249 of the record gives multiple examples of harm where Hindi women have been threatened based on their marriage to a – usually a Muslim man. And as the immigration judge noted, although not specifically cited by the Board, in most of these instances, the offended families try to stop the marriage before it ever happens. In this case, not only did no one in Mr. Rawat's family attempt to stop the marriages, they didn't make any threats until six months after Ms. Grassi had married Mr. Rawat and left for the United States. So it was nine months of apparent knowledge of the marriage and its upcoming marriage and then the actuality of the marriage before any threats were made – allegedly made. Anything else that your brief didn't cover? I don't think so, Your Honor. I think because the immigration judge – the Board rightly found that Mr. Rawat had failed to provide sufficient corroboration regarding the plausibility of his claim, we believe the petition for review should be denied. Thank you, Your Honor. Thank you. I'd like to just briefly touch on – because I know I don't have much time – the comment about the objective evidence not having particular instances of male Hindus being persecuted because they married an American female Christian. Well, that's just not the test. The test is whether the objective record is consistent with that. And here you have the Indian Supreme Court saying that violence is a serious problem for people who marry outside of their caste and outside of their religion. And that is – that has to meet the consistency test, whether or not there's a specific incidence of somebody in Mr. Rawat's precise conditions. I'd also like to point out really quickly that in order to get to the – to assume that there was no beating, you also have to ignore the fact that Mr. Sharma said he was there when Mr. Rawat filed this police report. He saw it taken. He saw it received by the police. And you have to ignore the – or at least disregard or discount the psychologist's evaluation that said Mr. Rawat's stresses and fears and anxieties are all consistent with 19 months of beatings and calls that he claims he received. When you take all of that evidence that was provided – and, you know, this is a situation where you can't – there are no video cameras showing these. There are no phone recordings of the calls. There's only so much he can provide, and he's tried to provide everything he can. And given that, I think there's plenty of material to reverse the credibility finding and grant him asylum and remand for exercise of discretion. Thank you. Also, Ms. Munro, I thank you and your firm, Perkins, Kiwi, Brown & Bain, for taking this on pro bono. Thank you very much. It was a wonderful experience. I really appreciate it. Thank you. Okay. Rawat v. Holder will be submitted.
judges: Goodwin, Hawkins, Wardlaw